UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| DONNA M. SWARTOUT,          )<br>                             )<br>     Plaintiff,             )<br>                             )<br>     v.                      )     Case No. 07-4058<br>                             )<br>MICHAEL J. ASTRUE,           )<br>Commissioner of Social Security )<br>Administration,             )<br>                             )<br>     Defendant.              ) | |

## O R D E R

This matter is now before the Court on Plaintiff's Motion for Summary Reversal and the Commissioner's Motion to Affirm. For the reasons set forth below, Plaintiff's Motion for Summary Reversal [#10] is DENIED, and the Commissioner's Motion to Affirm [#13] is GRANTED.

### BACKGROUND

Plaintiff, Donna Swartout ("Swartout"), was 58 years' old at the time of her administrative hearing. (R38) She has a high school education plus CNA training, is married, and lives with her husband. (R39) In the past, Swartout has been employed as a housekeeper in a hospital, dietary aide, and a window assembler. (R39, R54-55)

On August 16, 2004, Swartout applied for disability insurance benefits ("DIB"), alleging disability that began on June 30, 2003. (R37) Her application was denied both initially and on reconsideration. (R77-80, R85-89) Swartout requested a hearing before an

administrative law judge ("ALJ"). A hearing was held before ALJ E. James Gildea on March 1, 2007, at which Swartout, who was represented by counsel, and vocational expert ("VE") George Paprocki appeared and gave testimony. (R34-61)

Swartout testified that she can't endure things like she used to and has to take periods where she just lays down. (R49) She is no longer able to keep up with household chores, such as vacuuming, laundry, cooking, and cleaning. (R49-51) Swartout stated that she can only tolerate about 20 minutes of standing or sitting at a time. (R51-52) She cannot stand up by herself to get dressed, but rather has to hang onto things. (R52) Swartout used to walk 5 miles at a time, but can no longer walk any real distance, but she does go to the YMCA for water therapy. (R47, R52)

She suffers from weakness in her body, particularly in her legs, insomnia, and lower back pain. (R43) Swartout has been diagnosed with fibromyalgia, bulging discs in her back, and osteoarthritis. (R43-44) In the past, she had back surgery, surgery to correct carpal tunnel syndrome, and arthroscopic knee surgery. (R43-45) Her hands get weak if she raises them above her head, and she loses strength in them if she uses them too much. (R44)

In January 2005, Swartout began to see Dr. Archana Wagle for pain management every six to eight months. (R40, R334) Within the last 12 months, she had also seen Dr. Michael L. Cullen for testing to see where she was at physically and her regular doctor, Dr. David Ade. She was taking Trazondone, Clonazepam, Prevacid, Tramadol for pain, and another medication for migraine headaches. (R41)

The ALJ presented the VE with the following hypothetical:

> I'd like you to assume a hypothetical individual, first closely approaching advanced age with a high school education, with the same past relevant work as the Claimant, had the residual functional capacity to perform at the light exertional level. I take it that the jobs, hospital cleaner and the other job would -
>
> A: Dietary aid, as she performed them, would fall under the light category.
>
> Q: But not as performed in the national economy, right?
>
> A: That's correct.
>
> Q: And if we were to add to that hypothetical that the job not require more than occasional posturing, would your answer change?
>
> A: Yes. Most of those jobs would require more than occasional postural changes [i.e., bending, stooping, twisting, climbing, balancing, kneeling, crouching, crawling]. That would be at the frequent level as far as stooping.
>
> Q: In that event, what, if any, other jobs would there be that would fit that hypothetical?

(R56)  VE Paprocki testified that this hypothetical individual could perform the job of housekeeping cleaner, for which there are 7,500 jobs in the state of Iowa, 7,500 jobs within the region, and 428,000 jobs on a nationwide basis.  Id.  Another position would be an office helper, for which there are 1,000 jobs within the region and 139,000 jobs nationally. (R56-57)  Finally, the VE identified the job of a photocopy machine operator, which offers 850 jobs in the state of Iowa and 50,000 jobs in the national economy.  (R57)

If the hypothetical was amended to assume that sitting/standing was limited to 20 minutes at a time with the need to alternate every half-hour, then the VE indicated that the hypothetical individual could not perform the unskilled, light jobs that had been identified. (R58) If the individual would need to take two, 10-15 minute unscheduled rest breaks

during the day, that would also probably affect her ability to perform the identified jobs on a daily basis. (R59)

On April 26, 2007, the ALJ issued his decision. (R10) The ALJ found that Swartout's fibromyalgia was a "severe" impairment based on the requirements in the Regulations. (R15) The ALJ determined, however, that Swartout does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (R18) He recognized possible impairments posed by obesity, osteoarthritis of the left knee, neck, or hands, or left carpal tunnel syndrome, noting that even if such impairments could be deemed severe, they would still not meet or medically equal any relevant listing. Id.

After considering the medical evidence in the record and relevant credibility factors as a whole, the ALJ found that while Swartout's medically determinable impairment could have been reasonably expected to produce the alleged symptoms, the degree of the intensity, persistence, and limiting effects of her alleged limitations are not fully credible or substantiated by the record. (R20) The ALJ determined that Swartout had the following residual functional capacity:

> [T]he claimant can perform the exertional demands of light work, which require occasional lifting and carrying of up to twenty pounds and frequent lifting and carrying of up to ten pounds . . . .An ability to engage in the exertional demands of light work would involve the ability to stand or walk for at least six hours in an eight-hour workday.

(R31) Accordingly, the ALJ found that as of her date last insured, Swartout retained the ability to perform a full range of light work and could have returned to her past relevant work as a dietary aide and hospital cleaner as she actually performed those jobs. Id.

The ALJ further noted that even if Swartout was unable to perform her past relevant work and was restricted to a limited range of light work, there were still a significant number of jobs in the national economy which she could have performed. (R32) Based on a consideration of her age, education, work experience, and residual functional capacity, the ALJ concluded that she was not under a disability as defined under the Social Security Act at any time on or before June 30, 2003. (R32-33)

Swartout submitted a Request for Review of Hearing Decision. (R7-9) On August 24, 2007, the Appeals Council declined review of her claim, and the ALJ's decision became the final decision of the Commissioner. (R4-6) This appeal followed. The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

In order to be entitled to DIB, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. *See* 20 C.F.R. §§ 404.1566, 416.966 (1986).

The establishment of disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. McNeil v.

Califano, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step test. See 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed; (2) is the plaintiff's impairment "severe" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. Garfield v. Schweiker, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. Tom v. Heckler, 779 F.2d 1250 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. Pugh v. Bowen, 870 F.2d 1271 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a

whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504 (1985); Imani v. Heckler, 797 F.2d 508 (7th Cir.), *cert. denied*, 479 U.S. 988, 107 S.Ct. 580 (1986).

In her appeal, Swartout raises essentially three claims: (1) the ALJ erred by discounting the effects of fibromyalgia based on the lack of objective findings; (2) the ALJ erred by substituting his independent medical judgment for that of a doctor; and (3) the ALJ erred by failing to assess disability following the date last insured and by failing to obtain medical expert evidence to properly infer the date of onset. The Court disagrees and finds that the ALJ's finding that Swartout has the residual functional capacity to perform the physical exertion and nonexertional requirements of a range of unskilled light work with certain limitations is supported by substantial evidence.

A.    Discounting Effects of Fibromyalgia

Swartout first cites Sarchet v. Chater, 78 F.3d 305, 306-07 (7th Cir. 1996), in arguing that the ALJ cannot discount the disabling effects of fibromyalgia due to the lack of objective findings, as the symptoms are entirely subjective and objective findings are often unavailable. Critically, she fails to acknowledge the very limited period of time at issue in this case, as she has alleged an onset date of June 30, 2003, which coincides with her date last insured.

To prevail on a claim for DIB, Swartout must establish that she was insured, applied for benefits, and was currently disabled or had a disability that ended within the 12-month period before she applied. 42 U.S.C. § 423(a)-(b). Thus, she bears the burden of proving

that she was under a disability on or prior to June 30, 2003, when her insured status expired, or she is ineligible to receive benefits as a matter of law. 42 U.S.C. §§ 423(a)(1)(A) and 423(c)(1); 20 C.F.R. §§ 404.131(a) and 404.320(b)(2); Stevenson v. Chater, 105 F.3d 1151, 1154 (7th Cir. 1997). Interestingly, Swartout states on page 14 of her brief that she "is not claiming to be disabled prior to June 30, 2003." This in and of itself is fatal to her claim, as June 30, 2003, was her date last insured.

Moreover, the detailed Decision indicates that the ALJ considered subsequent medical evidence bearing on Swartout's fibromyalgia.

> Because a claimant's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR describes the kinds of evidence, including the factors below, that the undersigned must consider in addition to the objective medical evidence when assessing the credibility of the claimant's statements: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms . . . and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

(R18-19).

Plaintiff testified that her condition at the time of the hearing was "dramatically different" than it was in 2003 and had progressed. (R49) She does not have the same "functioning capacity" and could no longer endure things as long. Id. At the time of her hearing, she had to take periods and just lay down and could no longer keep up her house like she used to. Id. When asked if she thought she was able to function a lot better in

2003 than in 2007, Swartout responded, "Yes, I was. Yes, I was." Id. In 2003, she was able to do "a lot more things around the house like, you know, do household chores and stuff like that . . . ." Id. In October 2002, she was still able to walk 1.5 miles a day. (R53)

From February 2001 through September 2003, Swartout contacted her primary physician, Dr. Ade, at least eight time. (R21) With the exception of a complaint of numbness in her left hand and pain below her knees in May 2002 and a complaint of left-side numbness in July 2002 that produced a negative work-up, these calls were all for relatively minor complaints, such as sinusitis, refill of migraine medication, respiratory infection, sore throat, poison ivy, and a bone scan. Id.

The ALJ noted that medical records from June 25, 2002, contain complaints of pain in Swartout's neck and left shoulder, as well as achiness in her fingers. (R20) She had been evaluated and offered physical therapy, and although she reported throbbing in her legs at night, an evaluation for deep venous thrombosis had been normal. Id. At that time, her only medication was Premarin. Id. Dr. Cullen noted that an EMG and nerve conduction study were normal. Id. Swartout was able to move without evidence of musculoskeletal disability, and her neck had a full range of motion. Id. Other than some decreased sensation in her left foot, her neurologic functioning was normal. Id. She had some tenderness in her left shoulder and leg, which Dr. Cullen found to be consistent with a musculoligamentous etiology. Id.

On June 29, 2002, Swartout had an MRI of her cervical spine to evaluate her complaints of left shoulder pain; the results of the test were negative. (R22) CT scans and carotid Doppler tests were normal on July 23, 2002. Id. Despite complaints of left-side numbness, a physical examination on August 5, 2002, was normal. Id. In August 2002,

Swartout reported that she was "kind of achy" afterward, but could shop and be on her feet for 12 hours. Id. She displayed some limited range of motion in her left shoulder and tenderness in her left leg, she demonstrated symmetric reflexes and a normal gait. Id. Physical therapy produced a noticeable decrease in her shoulder symptoms and improvement in her range of motion, as well as increased tolerance for prolonged walking. (R22-23) Continued subjective and objective improvement was noted by the physical therapist on September 23, 2002. (R23) On October 14, 2002, Swartout reported that her legs had improved to the point where she was walking 1.5 miles many days of the week. Id. Dr. Cullen noted overall improvement and released her from his care. Id.

Swartout did not see Dr. Cullen again until June 23, 2003, just a week before her alleged onset of disability and date last insured. Id. She reported waking up with a stiff neck and pain in her left arm/hand. Id. Although she complained that she had been experiencing pain since the first of the year, she was not taking any medications at that time. Id. She was able to ambulate with a modicum of musculoskeletal distress and displayed a number of tender points, but her reflexes were symmetric and physiologic. Id. Dr. Cullen noted no sensory deficits and appropriate strength. Id. He assessed probable fibromyalgia and ordered several tests. With the exception of an EMG and nerve conduction study revealing mild left median neuropathy at the wrist, these tests were all normal. Id.

After reviewing the test results, Dr. Cullen stated that the physical examination was essentially unchanged, noted probable fibromyalgia, and referred Swartout to a rheumatologist for an evaluation. Id. On August 18, 2003, Swartout complained of pain in her left hand, as well as pain in her neck and right arm, and indicated that the Ultracet

was providing some relief. Id. Dr. Cullen observed multifocal points of tenderness but intact neurological functioning. Id. At this point, Dr. Cullen added probable left carpal tunnel syndrome to his diagnosis and prescribed a wrist splint and continued taking of Ultracet. (R24)

In September 2003, Swartout saw a rheumatologist, Dr. Michael Miniter. Id. The ALJ noted that the symptoms she reported to Dr. Miniter were far in excess of anything that she had ever reported to Dr. Cullen. Id. On physical examination, Dr. Miniter found a full range of motion with no pain or tenderness in her wrists, good range of motion with some tenderness in her shoulders, diminished range of motion with pain and tenderness in her neck, good range of motion with some tenderness in her lower back and hips, slightly diminished range of motion with tenderness in her knees, and no weakness in either the upper or lower extremities. (R94) Dr. Miniter recommended treatment consisting of stretching exercises and physical therapy, as well as Trazadone for her fibromyalgia. (R95)

In October 2004, Dr. Vincent Francis reviewed the medical evidence of record and completed a Residual Functional Capacity Assessment ("RFCA") of Swartout. (R240-47) Based on the available evidence, Dr. Francis determined that at the time she was last insured, she was capable of lifting 20 pounds occasionally and 10 pounds frequently, standing/walking/sitting for about six hours in an eight hour day, and had no postural, manipulative, visual, communicative, or environmental limitations. Id. Thus, Dr. Francis found that Swartout had the RFC to perform a full range of light work as of June 30, 2003. This assessment was affirmed by Dr. Barry Free and another physician in December 2004. (R247)

Accordingly, contrary to Swartout's assertion, the record clearly reflects that the ALJ did give consideration to the effects of her fibromyalgia that he found to be supported by credible evidence in the record. The ALJ also properly considered medical evidence from after her date last insured in an attempt to place her condition on June 30, 2003, into context.

Swartout criticizes the ALJ for not adequately acknowledging that her condition deteriorated significantly between June 2003 and June 2006. However, she misunderstands the nature of the inquiry that must be performed here and the significance of her date last insured. The issue is whether or not she was disabled on June 30, 2003, and any deterioration in her condition following that date is legally irrelevant to the determination of whether she is entitled to receive DIB in this case. Estok v. Apfel, 152 F.3d 636, 638 (7th Cir. 1998); Casey v. Secretary of Health & Human Services, 987 F.2d 1230, 1233 (6th Cir. 1993). Swartout's argument to the contrary must be rejected, particularly given her admission that she is not claiming to have been disabled on June 30, 2003.

    B.    <u>Discounting Physician's Opinion</u>

Swartout argues that the ALJ erroneously discounted Dr. Miniter's observation that she was extremely deconditioned and substituted his own judgment. The Court first notes that Dr. Miniter gave his opinion after meeting Swartout once and that his opinion was somewhat contrary to the opinions and observations offered by Dr. Cullen, who treated her regularly for years.

The Seventh Circuit has recognized that a treating physician's opinion is not binding on the Commissioner. Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982). However,

there is no presumption of bias against a treating physician's disability opinion. Edwards v. Sullivan, 985 F.2d 334, 337 (7th Cir. 1993). Rather, the ALJ, as the trier of fact, must consider the treating physician's possible bias. Id. The Commissioner will not give controlling weight to the treating physician's opinion on the nature and severity of the claimant's impairments unless the treating physician's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques. . . ." 20 C.F.R. § 416.927(d)(2).

> In short . . . it is up to the ALJ to decide which doctor to believe -- the treating physician who has experience and knowledge of the case, but may be biased, or that of the consulting physician, who may bring expertise and knowledge of similar cases -- subject only to the requirement that the ALJ's decision be supported by substantial evidence.

Micus v. Bowen, 979 F.2d 602, 609 (7th Cir. 1992).

It is the province of the ALJ to resolve evidentiary conflicts. Ehrhart v. Secretary of Health and Human Services, 969 F.2d 534, 542 (7th Cir. 1992); Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). The existence of an evidentiary dispute is not grounds for reversing the ALJ's decision to credit one version of facts over another. Herr v. Sullivan, 912 F.2d 178, 181 n.4 (7th Cir. 1990)  However, the ALJ must explain with particularity the basis of his decision. Young v. Secretary of Health and Human Services, 957 F.2d 386, 393 (7th Cir. 1992).

Dr. Miniter's observation of extreme deconditioning was discounted after the ALJ properly noted that it was devoid of any objective evidence, contrary to other objective evidence in the record, and contrary to the observations of her regular treating physician. See Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995) (finding it entirely permissible to discount the opinion of a treating physician where the opinion is unsupported, internally inconsistent, or inconsistent with other evidence.) In fact, Dr. Miniter's observation included normal balance, full or good range of motion in many areas, "[n]o weakness either proximally or distally involving the upper or lower extremities or the neck flexors," normal pulses and no evidence of edema or atrophy. (R194) There is nothing in Dr. Miniter's September 5, 2003, report to suggest that he observed her doing anything other than coming into the room for her appointment and moving slowly or had any other objective basis for his conclusion of "extreme deconditioning." Thus, the ALJ considered but reasonably discounted this observation by Dr. Miniter, as it was either unsupported by or contradictory to other objective medical evidence in the record. His rationales for doing so were sufficiently articulated in his written decision, and his conclusions are supported by substantial evidence.

The ALJ also discounted Swartout's subjective complaints of pain and alleged limitations. The record indicates that in considering Swartout's RFC, the ALJ gave full consideration to the medical evidence of record, fully considered her subjective complaints of pain, and credited them to an extent as far as they were consistent with objective evidence in the record. It is well-settled that "[a]n ALJ may discount subjective complaints of pain that are inconsistent with the evidence as a whole." Knight, 55 F.3d at 314. Factors to be considered include: a claimant's activities of daily living; location, duration, intensity,

and frequency of pain; dosage and effectiveness of medication; and other measures taken to relieve the pain.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii).  Again, such credibility determinations may not be overturned by this Court unless they are patently wrong.  Herr, 912 F.2d at 182; Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

In reaching the conclusion that Swartout's testimony was not fully credible regarding her ability to perform a full range of light work, the ALJ relied on the following facts:  no physician of record has made examination findings indicating that she was limited to the degree claimed as of her date last insured; the record contains no documented RFC assessment limiting her to the degree asserted as of her date last insured and in fact, contains some evidence indicating that she was not so limited at that time; and she had not seen Dr. Cullen for eight months before appearing on June 23, 2003, and was taking no medications for her alleged pain at that time.  Dr. Cullen further noted that she ambulated with only a "modicum of musculoskeletal distress" on June 23, 2003, and that she was neurologically preserved "with intact strength, reflexes" on August 18, 2003.  (R197, R199) After a review of the entire record, this Court finds that the ALJ's credibility determination was not patently wrong but was, in fact, reasonable.

The ALJ's decision was also supported by the testimony of the VE, who identified a significant number of unskilled, light jobs in the economy that would accommodate an individual with her education who is limited to 20 pounds occasional lifting, ten pounds frequently lifting, and could sit or stand up to six hours a day with normal routine changes. Given these restrictions that the ALJ found to be supported by the objective evidence in the record, the VE identified more than 9,300 jobs locally and 617,000 jobs nationally.  See Lee

v. Sullivan, 988 F.2d 789, 794 (7th Cir. 1993) (holding that positions in excess of 1,400 exist in significant numbers).

Swartout has the burden of demonstrating that she was disabled as of her date last insured and providing medical evidence in support of her claim. Scheck v. Barnhart, 357 F.3d 697, 702 (7th Cir. 2004). Here, she clearly had all of the process to which she was due and had a full and fair opportunity to present her claims. Nevertheless, the record contains her admission that she is not claiming to have been disabled by her condition on June 30, 2003, and no objective medical evidence that is inconsistent with the ALJ's findings as of her date last insured. This is not a case where medical records were insufficient or incomplete, which could necessitate further development of the record. Rather, the medical records simply failed to compel the conclusion that Swartout was disabled within the meaning of the Act on June 30, 2003.

The record would support the conclusion that Swartout's condition has significantly deteriorated since 2004, but that is not the issue before the Court and does not justify a different result under the law. Accordingly, the Court must conclude that the ALJ's determination was supported by substantial evidence.

C.   Failure to Obtain Expert Opinion of Onset Date

Finally, Swartout argues that the ALJ must use the services of an expert to determine a date of onset of disability when an impairment is slowly progressing and that he should have used that to assess whether she became disabled at any time after June 30, 2003. Again, this argument reflects Swartout's basic misunderstanding of what she needs to establish in order to be entitled to receive DIB. Even assuming arguendo that she did become disabled at some time after June 30, 2003, she would not be entitled to

benefits as she was not disabled on or before her date last insured.  Stevenson, 105 F.3d at 1154.  Moreover, an ALJ is only required to determine a precise onset of disability if he determined that she became disabled prior to the expiration of her insured status, a fact which Swartout concedes was not true in this case.  Accordingly, the ALJ was not required to determine a precise onset date in this case, much less obtain expert testimony in order to make such a determination.

**CONCLUSION**

For the reasons set forth herein, Plaintiff's Motion for Summary Judgment [#10] is DENIED, and the Commissioner's Motion to Affirm [#13] is GRANTED.  This matter is now TERMINATED.

ENTERED this 29th day of December, 2008.

        s/ Michael M. Mihm
        Michael M. Mihm
        United States District Judge